Not for Publication

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Criminal Action No.: 22-0374 (ES) |
| Plaintiff, | |
| v. | OPINION |
| **MARC SCHESSEL,** | |
| Defendant. | |

**SALAS, DISTRICT JUDGE**

This matter comes before the Court by way of defendant Marc Schessel's ("Defendant") motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("Rule") 29, or alternatively, motion for a new trial pursuant to Rule 33. (D.E. No. 294 ("Motion" or "Mov. Br.")). On July 10, 2024, a jury convicted Defendant of two counts of securities fraud pursuant to 15 U.S.C. §§ 78j(b), 78ff and 18 U.S.C. § 1348, as charged in the indictment (D.E. No. 1 ("Indictment")). (D.E. No. 289 at 3709:4–9). For the reasons set forth below, the Court **DENIES** Defendant's Motion.

### I.     BACKGROUND

On May 31, 2022, a federal grand jury sitting in Newark, New Jersey, returned the Indictment against Defendant, charging him with two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, as well as 18 U.S.C. § 1348. (D.E. No. 1). With respect to Count I, the Indictment alleged that between March and April of 2020, Defendant used his position as Chief Executive Officer ("CEO") of SCWorx Corp. ("SCWorx"), a publicly traded company, to make material misrepresentations and omissions to investors, prospective investors, and the Securities

Exchange Commission ("SEC"), which led to investor losses of over $100 million. (D.E. No. 1 ¶ 1). Specifically, the Indictment alleged Defendant (i) employed devices, schemes, and artifices to defraud, (ii) made and caused others to make material misrepresentations and omissions, and (iii) engaged in acts, practices, and courses of business which operated as fraud and deceit on purchasers and sellers of SCWorx's securities by issuing public statements with material misrepresentations and omissions regarding SCWorx's procurement of COVID-19 test kits. (*Id.* at 3 (Count I)).

With respect to Count II, the Indictment alleged that Defendant knowingly and intentionally (i) executed a scheme to defraud persons in connection with securities of an issuer with a class of securities registered under the Securities Exchange Act of 1934 (the "Act") and required to file reports under the Act, and (ii) obtained, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under the Act and required to file reports under the Act, by defrauding investors in SCWorx's securities through the issuance of public statements that included material misrepresentations and omissions regarding SCWorx's procurement of COVID-19 tests. (*Id.* at 15 (Count II)).

On July 10, 2024, following a fifteen-day trial, a jury convicted Defendant on both counts of securities fraud. (*See* D.E. Nos. 273–289 (finding Defendant guilty on Counts I & II)). On July 2, 2024, after the close of the Government's case, Defendant moved for judgment of acquittal pursuant to Rule 29 and the Court reserved its ruling. (D.E. No. 285 at 3066:18–3073:10). At the conclusion of trial, Defendant renewed his motion for judgment of acquittal, and the Court set a briefing schedule. (D.E. No. 289 at 3711:19–3713:12). On August 15, 2024, Defendant filed a brief in support of his motion for judgment of acquittal and moved, in the alternative, for a new

trial under Rule 33. (Mov. Br. at 15[1]). On September 18, 2024, the Government opposed (D.E. No. 295 ("Opp. Br.")), and on October 3, 2024, Defendant replied (D.E. No. 296 ("Reply Br.")). The Court has considered the voluminous record[2] and the parties' submissions in deciding Defendant's Motion, and writes primarily for the parties, who likewise are well-versed in the extensive evidence and procedural posture of the instant case.

## II.     LEGAL STANDARDS

### A.    Motion for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, the Court "must uphold the jury's verdict unless *no reasonable juror could* accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt." *United States v. Fattah*, 914 F.3d 112, 182–83 (3d Cir. 2019) (emphasis added). In reviewing the sufficiency of the evidence, the Court must view the evidence in the "light most favorable" to the Government, *id.* at 183, and "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006). "A finding of insufficiency should be confined to cases where the prosecution's failure is clear." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (internal quotation marks omitted). Hence "[t]he burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Lore*, 430 F.3d 190, 203 (3d Cir. 2005).

---

[1]   Other than one passing reference to a motion for a new trial under Rule 33 in the conclusion of Defendant's moving brief (*see* Mov. Br. at 15), his submission contains no specific or separate arguments pursuant to Rule 33 (*see generally id.*). Accordingly, the Court construes all arguments as applicable to Defendant's request for both judgment of acquittal and a new trial under Rules 29 and 33. The Court's analysis below similarly applies to both requests.

[2]   The Court's familiarity with the record is bolstered by the fact that the parties tried this matter twice before the Undersigned. (*See, e.g.*, D.E. Nos. 135–212). The first trial resulted in a mistrial following a poll of jurors, specifically juror number twelve. (*See, e.g.*, D.E. No. 206 at 3199:18–20).

**B.     Motion for a New Trial**

A defendant may move for a new trial pursuant to Federal Rule of Criminal Procedure 33, which provides in pertinent part that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  The defendant "bears the burden of persuading the trial court that the interest of justice requires the grant of a new trial." *United States v. Ray*, No. 12-0058, 2016 WL 5787345, at *3 (M.D. Pa. Oct. 4, 2016) (quoting *United States v. Hammer*, 25 F. Supp. 2d 518, 534 (M.D. Pa. 1998)).  "[M]otions for new trials are disfavored and are only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 F. App'x 513, 516 (3d Cir. 2003) (citing *United States v. Allen*, 554 F.2d 398, 403 (10th Cir. 1977)).  "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)).  "Thus, '[m]otions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases.'" *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (alteration in original) (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).  When considering a Rule 33 motion, the district court does not view the evidence in the light most favorable to the Government, but "exercises its own judgment in assessing the Government's case." *Johnson*, 302 F.3d at 150.

### III. ANAYLSIS

#### A. Overview of Counts I–II and Defendant's Arguments

##### i. Count I – 15 U.S.C. §§ 78j(b), 78ff[3]

With respect to Count I, the Act makes it unlawful:

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) ("Section 10(b)"). Pursuant to its rule-making authority under the Act, the SEC promulgated Rule 10b–5 to implement Section 10(b), which makes it unlawful for any person, in connection with the purchase or sale of any security, to

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

---

[3] 15 U.S.C. § 78ff outlines penalties for those who violate Section 10(b).

### ii. Count II – 18 U.S.C. § 1348

With respect to Count II, the Act, makes it a crime:

> (1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. [§] 78l) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. [§] 78o(d)); or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. [§] 78l) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. [§] 78o(d)).

18 U.S.C. § 1348. The Government "need only prove one of § 1348's two subsections" to establish securities fraud. *United States v. Hatfield*, 724 F. Supp. 2d 321, 324 (E.D.N.Y. 2010); *accord United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012).

Each subsection of Section 1348 has slightly different elements. Under Section 1348(1), the Government must prove: (i) "fraudulent intent"; (ii) "a scheme or artifice to defraud"; and (iii) "a nexus with a security." *Hatfield*, 724 F. Supp. 2d at 324 (quoting *United States v. Mahaffy*, No. 05-0613, 2006 WL 2224518, at *12 (E.D.N.Y. Aug. 2, 2006)); *accord United States v. Motz*, 652 F. Supp. 2d. 284, 294 (E.D.N.Y. 2009). Under Section 1348(2), the Government must prove (ii) "a scheme or artifice"; (ii) "to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property; while possessing" (iii) "fraudulent intent." *Hatfield*, 724 F. Supp. 2d at 324. The Government must also prove a nexus with a security. Finally, under both subsections, the Government must prove the "security" involved is "of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. [§] 78l)

6

or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. [§] 78o(d))." 18 U.S.C. § 1348.  Relevant here, the Court instructed the jury with respect to Section 1348(1) only.  (D.E. No. 287 at 3496:4–5 & 3513:3–16).  Accordingly, the Court's analysis is confined to Section 1348(1) and the corresponding elements.

Defendant makes several arguments in moving for judgment of acquittal and, alternatively, a new trial.  **First**, Defendant maintains that the Government did not prove he engaged in securities fraud under Counts I and II because the United States Food & Drug Administration's ("FDA") policy governing COVID-19 tests, that issued on March 16, 2020, "did not prohibit parties from contracting to purchase and resell COVID-19 tests regardless of the FDA status of those tests" nor did it prohibit the marketing and distribution of COVID-19 tests.  (Mov. Br. at 4–6).  **Second**, Defendant argues that the Government "was required to prove the objective falsity of SCWorx's statements pursuant to *United States v. Harra*[,] 985 F.3d 196 (3d Cir. 2021)."  (*Id.* at 7–9).  **Third**, Defendant asserts that the Government "failed to establish that the contract [for COVID-19 tests] was illusory" and, consequently, that "the statements related to it were materially misleading or fraudulent."  (*Id.* at 9–13).  Moreover, Defendant claims the Government did not prove that he possessed "specific intent to defraud investors."  (*Id.*).  **Finally**, Defendant maintains that the Government's evidence did not establish "materiality" and that the testimony it elicited was based on improper hypothetical questions.  (*Id.* at 13–15).  In addition, Defendant incorporated all arguments made on the record at the conclusion of the Government's case-in-chief.  (*Id.* at 3, n.1 (citing D.E. No. 285 at 3067:7–3070:16)).

The Court examines each argument in turn, citing to the Government's arguments in opposition and Defendant's arguments in reply where necessary.

### B. The Government Presented Sufficient Evidence for a Reasonable Juror to Find, Beyond a Reasonable Doubt, that Defendant Engaged in Securities Fraud Based on Materially False and Misleading Statements.

The crux of many Defendant's arguments is that to prove securities fraud, the Government needed (and failed) to establish that the contracts for COVID-19 tests at issue in this case were a sham. (Mov. Br. at 5; *id.* at 9 (arguing that "[t]he evidence adduced at trial failed to establish that the contract at issue was illusory or incapable of being performed"); *see also id.* at 10 (arguing that the Government failed to establish that "Rethink My Health's cease and desist letters rendered the contract at issue null and void");[4] *id.* at 11 (arguing that "the Government's evidence failed to establish that the contract was illusory based on an alleged lack of funds held by SCWorx and Rethink My Healthcare"); *id.* at 13 ("In sum, the Government's theory of securities fraud was premised on the contention that there was no legitimate transaction to announce."); *see also* Reply Br. at 6 (arguing that "the Government offered no evidence that Rethink was not legally obligated to perform under the Purchase Order")).

For example, with respect to the FDA's policy, Defendant insists that the testimony of Mr. Allen Hill—an employee of the FDA—was irrelevant. (*Id.* at 5; *see also* D.E. No. 275 at 696:17–18). Defendant asserts that it was unnecessary for Mr. Hill to testify about (i) the FDA's review policy of entities' contracts for COVID-19 tests and corresponding processes before the marketing, sales, and distribution of such tests, and (ii) the fact that Promedical could not market, sell, or distribute its COVID-19 tests for failure to comply with the FDA policy between April 13, 2020, and April 17, 2020. (Mov. Br. at 5). Defendant grounds his argument in the fact that Promedical's first installment contract was set to begin on April 24, 2020—outside the period between April 13, 2020, to April 17, 2020—and the contention that Promedical's COVID-19 test completed an

---

[4] *See also* D.E. No. 285 at 3068:16–22.

internal review process on April 27, 2020.[5] (*Id.*; *see also id*. at 11 (arguing that "the Government's theory improperly characterized the nature of the contract by focusing only on the time period from April 13, 2020, to April 17, 2020, when, in fact, the contract performance period extended to at least April 24, 2020")).[6]

In addition, he asserts the public statements at issue required the COVID-19 tests that were the subject of the agreement between SCWorx and Promedical "to comply with 'FDA standards.'" (Mov Br. at 5). Thus, Defendant argues the Government "failed to prove that the contracts at issue could not have been performed but for the intervention of" third parties and Rethink's decision to withdraw its purchase order of COVID-19 tests from SCWorx—finalized on September 23, 2020. (*Id.*). Furthermore, Defendant contends that the Government presented no evidence that he "caused SCWorx to violate the FDA policy or make any misrepresentation based on that policy" because SCWorx merely entered into contracts—it did not market, distribute, or sell Promedical's COVID-19 tests. (*Id.* at 6).

Defendant also claims that the Government failed to prove he acted with *mens rea* and a "specific intent to defraud" under both counts of securities fraud. (*Id.*). Defendant asserts that to render his statements materially false or misleading, he would have had to have known he violated the FDA's policy, and the Government failed to prove that he knew Promedical's test had to complete an internal review process as purportedly required under said FDA policy per Mr. Hill's

---

[5] In a similar vein, Defendant argues that Mr. Peter Gallic never communicated to Defendant that Promedical's COVID-19 test had been taken off the FDA website prior to the issuance of the April 13, 2020 press release. (Mov. Br. at 9; *see also* D.E. No. 285 at 3067:20–3068:1). Moreover, based on both Mr. Gallic's and Neran de Silva's testimony, Defendant asserts that he had "a good faith basis to believe that the Promedical transaction was compliant with the FDA policy and would proceed because Promedical had been told by the FDA that they were authorized to sell and distribute the tests." (Mov. Br. at 10; *see also* D.E. No. 285 at 3068:2–15 & 3069:25–3070:4).

[6] Defendant makes a similar temporal argument with respect to the funding for the purchase agreement between SCWorx and Rethink. (Mov. Br. at 12–13 (arguing "the evidence established that Gallic believed that the transaction would be funded based on customers providing funding into an escrow account established by SCWorx" thus the "purported 'lack of funding' during the period between April 13, 2020, to April 17, 2020" was irrelevant and misled the jury); *see also* D.E. No. 285 at 3068:23–24).

testimony. (*Id.*).

The Government maintains that it presented sufficient evidence for a reasonable juror to find that Defendant "made false and misleading statements to investors" (Opp. Br. at 5) because it "demonstrated that he repeatedly withheld accurate or complete information to the public regarding the Promedical/Rethink COVID-19 test kit deal" (*id.* at 12). Furthermore, the Government contends that Defendant's arguments—rehashed from its motion to dismiss the Indictment—miss the mark with respect to the charges. (*Id.* at 5).

The Court agrees with the Government that the jury rejected Defendant's theory regarding the purported validity of the contracts at issue and, consequently, the purported truth of SCWorx's public statements. (Opp. Br. at 13). Relevant here and as set forth above, "the securities fraud scheme alleged in this case did not require the Government to prove beyond a reasonable doubt that the Defendant violated FDA policy when he contracted with Promedical for COVID-19 tests." (*Id.* at 5). Rather, the Government was required to prove that Defendant "made false and misleading statements concerning the Promedical/Rethink COVID-19 test deal including, but not at all limited to, statements concerning Promedical's FDA authorization," which had the ability to influence investors' investment decisions. (*Id.* at 5 & 19).[7] Thus, "the jury could have convicted the Defendant of securities fraud ***without*** evidence that the test kit deal was entirely fake." (*Id.* at 19 (emphasis added)). In addition, the Government is correct in that the Court's instructions to the jury made clear that the Government need **not** prove "that each of the Defendant's statements were ***literally*** false." (*Id.* at 5–6 (emphasis added); *see* D.E. No. 287 at 3501:14–22 & 3501:8–11).

---

[7] The inquiry is ***not***, as Defendant maintains, whether a deal ultimately would have been made if funding had been secured (*see* Mov. Br. at 11–12); rather, the Government had to prove that Defendant made false and misleading statements.

The Court further agrees that Defendant's public statements were materially false and misleading when made based on the Government's recitation of evidence, including but not limited to, the six categories of documents and evidence discussed therein and below. (*See* Opp. Br. at 6–12). By way of brief background, "[a] statement is false or misleading if it is factually inaccurate, or additional information is needed to clarify it." *In re Bell Atl. Corp. Sec. Litig.*, No. 91-0514, 1997 WL 205709, at *23 (E.D. Pa. Apr. 17, 1997), *aff'd.*, *In re Bell Atl. Corp. Sec. Litig.*, 142 F.3d 427 (3d Cir. 1998). "An omission can also satisfy this element where silence would make other statements misleading or false." *Id.* "Misrepresentations of historical fact," too, "clearly satisfy this requirement." *Id.*

***First***, the record contains ample evidence reflecting that Defendant misled investors regarding Promedical's purported FDA authorization to sell COVID-19 tests to SCWorx. (*Compare* GX-5, *with* GX-400, GX-470, GX-33-A, D.E. No. 277 at 1020 (Mr. Gallic's testimony), D.E. No. 281 at 1965 (Mr. Nossiff's testimony), D.E. No. 283 at 2543 (Mr. Wenhold's testimony), and D.E. No. 275 at 684–85 (Mr. Petty's testimony)). For example, during an investor call on April 15, 2020, Defendant stated he "spent weeks researching over 30 product . . . lines, . . . until [he] found an actual manufacturer that had a [COVID-19 test] kit that appeared to [him] at least to have all the attributes [he] was looking for" including "proper FDA authorizations under the emergency authorization act." (GX-5 at 8).[8] Meanwhile, among other contradictory evidence, on April 27, 2020, Defendant emailed counsel admitting that on the same day or one day prior, i.e., "[o]n April 14th or April 15th," SCWorx "received information that called into question Promedical'[]s CEO and his ability to support the contract that [Defendant] had just signed" which ultimately "forced [the CEO] to resubmit FDA paperwork in order to get his PEAU." (GX-400 at

---

8     All pin citations to the Government's exhibits are to page numbers of the individual PDFs.

4).  Contrary to Defendant's argument in reply (*see* Reply Br. at 4), the CEO did "*not* yet have" that paperwork but rather, was "'working' on it" (*see* GX-470 at 6).

***Second***, the Government put forth sufficient evidence indicating that Defendant misled investors concerning the timing of Promedical's supply of COVID-19 tests to SCWorx. (*Compare* GX-1, GX-3, GX-4, and GX-5, *with* GX-400, GX-470, D.E. No. 277 at 1051–52 (Mr. Gallic's testimony), and D.E. No. 283 at 2533 (Mr. Wenhold's testimony)).  For example, while Defendant represented that he anticipated receiving two million COVID-19 test kits in approximately two weeks from the date of the April 12, 2020, and April 17, 2020 press releases (GX-1 at 1 & GX-4 at 1), as well as during the April 15, 2020 call with investors (GX-5 at 8), he also stated, in an April 28, 2020 email to counsel, that the delivery of two million COVID-19 test kits would commence "around 2 weeks ***after making the required 50% deposit***" (GX-470 at 6 (emphasis added)).  Moreover, in the same April 28, 2020 email, Defendant stated that "[t]he plan was to execute the ProMedical Agreement, and then sign with Rethink – Rethink would then feel confident to go to its customers with this commitment from us and get the necessary purchase advances." (GX-470 at 6).  Thus, Defendant omitted the fact that the two-week delivery timeframe had been contingent on a deposit of funds that he expected from Rethink's purchase advances.

***Third***, the record contained sufficient evidence to establish that Defendant misled investors regarding SCWorx's funding for the Promedical COVID-19 test deal. (*Compare* GX-3, *with* GX-400, GX-470, GX-479, D.E. No. 277 at 966–77 (Mr. Gallic's testimony), D.E. No. 280 at 1922–24, and D.E. No. 283 at 2542 (Mr. Wenhold's testimony)).  For example, in Defendant's April 16, 2020 Form 8-K,[9] he stated that SCWorx was "required to pay 50% down at the time of order

---

[9] To the extent Defendant attempts to contest any aspect of the jury instructions or other rulings before or during trial, the Court stands firm on all decisions it made for the reasons stated on the record. (*See* Mov. Br. at 11, n. 2 (noting that the Court declined to instruct the jury on "the SEC rules governing filing a Form 8-K regarding entering into a material, definitive agreement and the termination of such a material, definitive agreement" (citing

placement, with the remaining 50% due upon completion of order and prior to shipping." (GX-3 at 2). However, as noted above, and in an email from Defendant to counsel, the agreement between SCWorx and Promedical provided for the delivery of two million COVID-19 test kits per week, commencing two weeks "***after making the required 50% deposit***." (GX-470 at 6 (emphasis added); *see also* GX-400 at 4).[10] Indeed, the fact that SCWorx had *not paid or received funding* for the COVID-19 testing kits as of April 13, April 15, April 16, and April 17—the date of the statements at issue—would have impacted investors' decisions to invest because, accordingly to Mr. Wenhold, "it would have contradicted everything the company had stated at that point, as far as the testing kit being – order being placed and being expected in that two-week window that they stated it was to be." (D.E. No. 283 at 2542:13–16).

***Fourth***, the Government provided ample evidence reflecting that Defendant misled investors about the finality of the Promedical/Rethink COVID-19 test deal. (*Compare* GX-1, GX-3, GX-4, and GX-5, *with* GX-228, GX-33-I, GX-32, D.E. No. 277 at 1003 (Mr. Gallic's testimony), D.E. No. 281 at 1954–55 (Mr. Nossiff's testimony), D.E. No. 283 at 2541–42 (Mr. Wenhold's testimony), and D.E. No. 275 at 683–84 & 686 (Mr. Petty's testimony)). For example, the April 13, 2020, press release stated that SCWorx "received a committed purchase order from Rethink My Healthcare, . . . for two million COVID-19 Rapid Testing Units." (GX-1 at 1; *see*

---

D.E. No. 286 at "3222 *et seq.*")); *see also* Reply Br. at 7 (arguing that the Government's theory of criminal securities fraud liability imposed requirements that are "antithetical to the current guidance issued by the SEC" (citing "Form 8-K, available at https://www.sec.gov/files/forms8-k.pdf")); *id.* at 9, n.1 (stating that Defendant's inability to argue a "valid defense" that the Promedical test was "authorized" under the FDA policy "deprived him of his right to present a defense in violation of Due Process and the Sixth Amendment")).

[10] Although Defendant contends that the Government did not cite to the entirety of GX-400, which he claims provides further context in support of his position, the Court disagrees. (*See* Reply Br. at 5–6). Indeed, when reading beyond the select portion of GX-400 quoted by Defendant, the communication reveals Defendant's thought process/plan and, consequently, reflects that his prior statements regarding the contract were false and misleading. (*See* GX-400 at 4 ("We viewed this as a temporary thing at that time and expected to fund within a few days and that this would not materially affect Rethink nor any of our financials as we could always catch that missing week up in volumes some time within the initial contracting period.")).

13

*also* GX-4 at 1 (reiterating, in the April 17, 2020 press release, that SCWorx had "receiv[ed] a committed purchase order from Rethink My Healthcare, . . . for two million COVID-19 Rapid Testing Units")). Yet, on April 17, 2020, Defendant sent Mr. Gallic a contrary text message stating "hey do we have an order in for [P]romedical – [I] was ill [I] can't remember." (GX-33-I at 1). Indeed, Mr. Gallic took the stand and testified that as of April 13, 2020, he believed the press release was misleading because it "speaks of surety" and in his own words "[t]here was no surety here." (D.E. No. 277 at 1003:8–9). He further noted "[t]here was no guarantee that this was going to happen at this point." (*Id.* at 1003:9–10).

*Fifth*, the record contains sufficient evidence showing that Defendant misled investors about the due diligence performed on the Promedicial/Rethink COVID-19 test deal. (*Compare* GX-5, *with* D.E. No. 283 at 2441–45 (Mr. Miceli's testimony), *id.* at 2494–95 (Mr. Faulkner's testimony), and *id.* at 2633 (Mr. Wenhold's testimony)). Here, Defendant stated, during the April 15, 2020 investor call, that in light of the demand he asked hospitals, including "Partners Healthcare in Boston and University of Vermont . . . to assist [him] in testing these new point of care test kits . . . quickly passing the kits to their labs and rapidly responding as to their effectiveness" which "allowed [him] a streamlined product approval platform unheard of in normal operating conditions." (GX-5 at 8). However, when representatives from those entities took the stand, they testified that they received no such sample kits for testing. (*See* D.E. No. 283 at 2441–45 (testifying that the University of Vermont Health Network did not, "to the best of [his] knowledge" receive "a sample of COVID-19 test kits" for testing from Defendant or SCWorx); *see also id.* at 2494–95 (same with respect to Partners Healthcare)).

*Finally*, the Government presented sufficient evidence indicating that Defendant misled investors about the quantity of COVID-19 tests Promedical would provide to SCWorx. (*Compare*

14

GX-1, GX-3, GX-4, and GX-5, *with* GX-272, D.E. No. 277 at 1036 (Mr. Gallic's testimony), D.E. No. 280 at 1838–39 (Mr. Nossiff's testimony), and D.E. No. 275 at 685 (Mr. Petty's testimony)). For example, in the April 13, 2020, and April 17, 2020 press releases alone, SCWorx confirmed an initial shipment of 2 million COVID-19 test kits. (*See* GX-1 at 1 & GX-4 at 1). To the contrary, Defendant received an invoice from Promedical on April 14, 2020, for only 1.5 million COVID-19 test kits. (GX-272). Furthermore, Mr. Gallic's testimony confirmed his understanding that Mr. De Silva had sold 500,000 test units to someone else because SCWorx did not fund the order yet; thus, Mr. De Silva could only supply 1.5 million in the first shipment. (D.E. No. 277 at 1036:23–25). Moreover, Mr. Petty testified that as an investor, he would have wanted to know about this change in the initial order quantity because "it impacts the bottom line." (D.E. No. 275 at 685:7–19).

For all of these reasons, Defendant's challenges to his securities fraud convictions fall short. *See, e.g.*, *United States v. McGee*, 763 F.3d 304, 316 (3d Cir. 2014) ("McGee cannot overcome the 'highly deferential' standard of review for sufficiency of the evidence." (quoting *United States v. Caraballo–Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013))); *United States v. Hart*, 273 F.3d 363, 372 (3d Cir. 2001) (holding that "[t]he evidence belies" defendant's claims that "the evidence at most proves negligence, not willful and knowing illegal conduct" but rather "demonstrates his willful and knowing participation in securities fraud").

### C. The Government Did Not Have to Prove that Defendant Made Objectively False Statements

Defendant cites to *United States v. Harra*, 985 F.3d 196 (3d Cir. 2021),[11] to support his contention that the Government was required to prove the objective falsity of SCWorx's

---

[11] As noted in the Letter Memorandum denying Defendant's motion to dismiss the Indictment (D.E. No. 228 at 4), in *Harra*, the Third Circuit held in the face of a sufficiency of the evidence challenge that, when a defendant is charged with false reporting under 18 U.S.C. § 1001 and 15 U.S.C. § 78m, "the prosecution must prove a statement

15

statements. (Mov. Br. at 7). In addition, Defendant argues that he maintained the FDA Policy was clear and unambiguous, but that Mr. Hill's testimony "added an administrative requirement not found in the policy, and thereby created ambiguity" in the purportedly "clearly communicated policy." (*Id.* at 7–8).[12] Defendant further claims that the Government did not present evidence indicating that the internal review process described by Mr. Hill had been known to the general public. (*Id.* at 9). As a result of this confusion, Defendant maintains the Court excluded a defense theory supported by the FDA Policy and that *Harra* should have been applied. (*Id.* at 7).

As previously stated in the Court's Letter Memorandum denying Defendant's motion to dismiss the Indictment, "*Harra* is simply inapplicable to this case." (D.E. No. 228 at 5). A plain reading of *Harra* makes clear that its holding is applicable to defendants charged with false reporting—a different crime than the securities fraud charges at issue here. (*See id.*; *see also Harra*, 985 F.3d at 204 (framing the issue as "[w]hen a defendant is charged with *false reporting* based on an ambiguous reporting requirement, what is the prosecution's burden at trial as to the element of falsity?" (emphasis added))). The Third Circuit based its holding on the notion that "an agency must have clearly communicated its policies before a private party may be sanctioned—much less criminally prosecuted—for violating *them*." *Harra*, 985 F.3d at 213 (emphasis added). Because Defendant was not charged or found guilty of false reporting or a violation of any agency policy, *Harra*'s logic remains inapposite. (*See* D.E. No. 228 at 5 (detailing the differences between false reporting and the securities fraud statutes that the jury found Defendant guilty of violating); *see also id.* ("Merely because part of Defendant's alleged scheme

---

false under each objectively reasonable interpretation of" the statute/regulation that the defendant allegedly violated. 985 F.3d at 208. For charges of false reporting, "[t]he Government must show not merely that a defendant subjectively intended to lie, but also that the statement in question was objectively false." *Id.* at 212.

[12] Defendant also maintains that "the alleged falsity and fraudulent nature of [his] statements to the market turned on the communication of the FDA Policy to the entities it regulated and those communications were, *arguendo*, ambiguous." (Mov. Br. at 8).

16

involved FDA regulations does not mean Defendant was charged with false reporting in violation of those regulations, and thereby that the Government must prove that Defendant's statements regarding FDA approval were objectively false."); D.E. No. 284 at 2914:21–2915:4 (The Court: "He's not charged with violating the FDA or its polices.  He's charged with making misrepresentations to investors about whether he had a secure deal with Rethink and Promedical. . . . [T]his is . . . not [about] a false statement as to an FDA regulation or policy.")).  Thus, the Court agrees that "[a]ny ambiguity about the FDA [policy] that defense counsel attempted to create during trial is irrelevant to the charges in this case, [and] does not support an argument that *Harra* applies." (Opp. Br. at 16).  Furthermore, Defendant provides no authority in which a court applied *Harra* in the manner he proposes—that is, in a case involving parallel securities fraud charges without a false reporting charge.  (*See* Mov. Br. at 7–9).[13]

Finally, Defendant attempts to conflate the Third Circuit's opinion in *Harra* as applicable to both the false reporting charges and securities fraud charges at issue "pursuant to 18 U.S.C. §§ 371 and 1348(1)." (Reply Br. at 7–8).  Although the Third Circuit "reverse[d] [d]efendants' false statements convictions and remand[ed] on those counts for entry of judgments of acquittal" it vacated and remanded for retrial "[d]efendants' conspiracy and securities fraud convictions . . . which were charged ***in the alternative on an independent theory of liability***." *Harra*, 985 F.3d at 204 (emphasis added); *see also id.* at 207 (noting the Government's separate theory that the "mass extensions . . . formed an alternate basis for liability for the conspiracy and securities fraud counts, independent of any false statements"); *id.* at 223 (holding that, under the Government's alternative

---

[13]    The Court also rejects Defendant's attempt to draw a parallel to the jury instruction in *Harra* as analogous to the jury instructions in this case.  (*See* Mov. Br. at 8).  Indeed, as noted above and by the Government in opposition, the jury instruction given in this matter also provided that "deceitful statements of half-truths or the concealment of material facts or the expression of an opinion not honestly entertained may constitute false or fraudulent statements." (Opp. Br. at 15 (quoting D.E. No. 287 at 3501:8–11)).

theory of securities liability, "a rational juror could conclude that [d]efendants had knowingly caused maturing loans to be extended in order to push them off the books for 2009 and conceal the poor financial health of the Bank from investors, and that they had knowingly joined an agreement to do so"). Moreover, retrial was necessary because the trial record reflected that the Government "repeatedly linked" its three theories together. *Id.* at 224 (noting that the Government "also failed to distinguish the evidence concerning [one] theory of fraud and the mass-extension scheme in its arguments before the District Court and the jury"). Accordingly, the Third Circuit could not find that "the erroneous jury instruction as to falsity did not contribute to the jury's verdict." *Id.* (cleaned up).

Here, by contrast, and as noted above, the Court's jury instructions made clear that the Government need not prove literal falsity of each and every alleged misstatement that comprised the Government's case—i.e., half-truths and omissions could also constitute misrepresentations under the securities fraud statutes. (*See* D.E. No. 287 at 3501:14–22 & 3501:8–11; Opp. Br. at 5–6). Moreover, even if Defendant's statements regarding the FDA policy could be read as akin to the SEC reporting statements at issue in *Harra*, the Government presented sufficient evidence on several other categories of misstatements, as reflected above, for a reasonable juror to convict Defendant of securities fraud.

For these reasons, the Court rejects Defendant's second bite at the *Harra* apple.

### D. The Government Did Not Use Improper Hypothetical Questions

Finally, Defendant contends the Government improperly "pose[d] factually inaccurate and misleading hypothetical questions to two investor witnesses" to establish materiality over his objection. (Mov. Br. at 13–14). In particular, Defendant takes issue with the Government's questions of (i) whether an investor's decision-making would have been impacted had he known

the transaction at issue was not finalized, despite Mr. Nossiff's continued work on the transaction, and (ii) "whether the investors would have wanted to know that [the] size of the initial order had changed" without regard to its impact on the first installment, which "amounted to only 1%." (*Id.* at 14). Ironically, defense counsel admits that on cross examination, he presented his own hypothetical questions to the Government's witnesses. (*See id.* at 14–15; *see also* Opp. Br. at 20, n.5).

Akin to Defendant's request to apply *Harra*, he provides no authority in support of the notion that the Government's hypothetical questions to investor witnesses on the issue of materiality were improper. (*See* Mov. Br. at 13–15; *see also* Opp. Br. at 19–20). The Court discerns nothing improper regarding the Government's hypothetical questions regarding materiality. *See, e.g.*, *United States v. Laurienti*, 611 F.3d 530, 549 (9th Cir. 2010) (holding that the district court did not abuse its discretion by allowing the Government's hypothetical questions of its own witnesses "to establish materiality of [d]efendants' actions"); *United States v. Jennings*, 487 F.3d 564, 582 (8th Cir. 2007) (finding that the district court did not err in allowing hypothetical questions concerning materiality reasoning that "[t]he government would be hard pressed to prove this element without asking whether the undisclosed information would have affected the decision maker's analysis"); *United States v. Ranney*, 719 F.2d 1183, 1189 (1st Cir. 1983) (finding that the district court was "eminently correct" in admitting hypothetical questions on materiality); *see also United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013) ("Although we have not addressed the issue squarely, other circuits have permitted the use of hypothetical questions to inquire into the effect of a fraud." (collecting cases in from the Tenth, Ninth, Eighth, Seventh, and First Circuits)); *United States v. Hatfield*, No. 06-0550, 2010 WL 2541057, at *2 (E.D.N.Y. June 10, 2010) (denying defendant's motion for reconsideration where "the [c]ourt's suggested phrasing also

would not ask the witnesses to assume Mr. Brooks' guilt. They would merely inquire into whether DHB's alleged misrepresentations or omissions, if true, affected the investor's total mix of information").

Even without these hypothetical questions, the Court agrees the Government presented sufficient evidence for a reasonable juror to find that Defendant's false and misleading statements were material to investors. (Opp. Br. at 20–21 (citing D.E. No. 275 at 660–62 (Mr. Petty's testimony regarding the significance of accurate company press releases on stocks he chooses to invest in), *id.* at 673 (Mr. Petty's testimony on the reasons why he initially invested in SCWorx's stock), D.E. No. 283 at 2526–27 (Mr. Wenhold's testimony regarding his stock purchasing decisions, including his use of press releases and SEC filings), *id.* at 2530–40 (Mr. Wenhold's testimony about his review of SCWorx's public statements and his decision to invest in its stock))).

### IV.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's motion for judgment of acquittal, and alternatively, for a new trial.

Dated: May 5, 2025                                                                     *s/ Esther Salas*
                                                                                       **Esther Salas, U.S.D.J.**